UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA, ex
rel. Katherine Brown, M.D., Amber
Bradshaw, and Vanessa Santos,
Plaintiffs

Case No. 6:13-cv-1773-ORL-22-KRS

v.

FILED *IN CAMERA* AND UNDER
SEAL PURSUANT TO 31 U.S.C.
§3730(B)

ASSOCIATES IN DERMATOLOGY,
INC., a Florida corporation;
MICHAEL STEPPIE, M.D.,
individually; and WILLIAM A.
STEELE, M.D., individually.

### AMENDED COMPLAINT

**COMES NOW**, Katherine Brown, M.D., Amber Bradshaw, and Vanessa Santos

("Relators") in the above-styled action, by and through their counsel, and state that this is

an action brought on behalf of the United States of America by Relators against

ASSOCIATES IN DERMATOLOGY, INC. ("ASSOCIATES"), a Florida corporation,

MICHAEL STEPPIE, M.D., individually, and WILLIAM A. STEELE, M.D.,

individually, pursuant to the Qui Tam provisions of the Civil False Claims Act, 31 U.S.C.

§ 3729-33 *et seq.*

I.   **NATURE OF ACTION**

1.   The United States brings this action to recover treble damages and civil

penalties against Defendants, pursuant to the Federal Civil False Claims Act, 31 U.S.C. §

3729-33 *et seq.* ("The False Claims Act").

2.    All of the foregoing claims are premised upon four (4) schemes to defraud the United States Government by submitting, or causing to be submitted, false and fraudulent claims to the Medicare, Medicaid, and TRICARE programs.

3.    The first scheme involves radiation treatment that was improperly administered by an unsupervised technician who was not qualified to perform these procedures without supervision and for which Defendants falsified, or caused to be falsified, the relevant records and billing statements to make it appear as though a physician had ordered, supervised, and approved these treatments.  This was done in order to generate a full reimbursement under government healthcare programs despite the fact that no physician had actually ordered, supervised, or approved these treatments.

4.    The second scheme involves surgeries performed by unsupervised non-physicians for which Defendants falsely submitted, or caused to be falsely submitted, bills to government healthcare programs that inaccurately reflected that these surgeries had been performed by physicians.

5.    The third scheme involves patient consultations and follow-up visits that were falsely billed to government healthcare programs as having been performed by physicians but were in reality conducted by physician's assistants or nurse practitioners without the required physician oversight.

6.    The fourth scheme involves Defendants' submission of bills to government healthcare programs for medically unnecessary biopsies.  Pursuant to this scheme, Defendants' nurse practitioners and physician's assistants were incentivized to perform biopsies through the payment of commissions.  Defendants would then analyze

the samples from the unnecessary biopsies in their own in-house laboratory in order to submit additional bills to the government healthcare programs for these unnecessary procedures.

## II.   JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction to entertain this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b). This Court has jurisdiction to entertain a qui tam action.  Relators are "original sources" and are otherwise authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33.  Relators have made voluntary disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

8.   The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), because Defendants are transacting and have transacted business in this District, and because Defendants committed acts within this District that violated 31 U.S.C. § 3729.

9.   Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants reside and/or transact business in this District, and because Defendants committed acts within this District that violated 31 U.S.C. § 3729.

## III.   THE PARTIES

10.   Defendant ASSOCIATES is a medical practice with its principal place of business in Kissimmee, Osceola County, Florida. At all relevant times, ASSOCIATES maintained locations in Orange, Lake, Seminole, Osceola, Brevard, and Polk counties.

These locations currently include: Altamonte Springs; Celebration; Clermont; Davenport; Dr. Phillips; East Orlando; Kissimmee; Ocoee; Poinciana; St. Cloud; and Sumterville.

11.     Defendant STEPPIE is a Florida citizen who, at all relevant times, resided and practiced medicine within the Middle District of Florida.

12.     Defendant STEELE is a Florida citizen who, at all relevant times, resided and practiced medicine within the Middle District of Florida.

13.     Relator Katherine Brown, M.D., was employed by Defendant ASSOCIATES for one day in January 2013, and currently resides within the Middle District of Florida. Relator Brown has direct and independent knowledge of the surgery scheme described in more detail below.

14.     Relator Amber Bradshaw was employed by Defendant ASSOCIATES as a medical assistant and radiation technician from June 2012 through August 2013 and resides in the Middle District of Florida. Relator Bradshaw has direct and independent knowledge of the radiation therapy scheme described in more detail below.

15.     Relator Vanessa Santos was employed by Defendant ASSOCIATES as a medical assistant and billing specialist from June 2003 to September 2007 and resides in the Middle District of Florida.  Relator Santos has direct and independent knowledge of Associates' fraudulent billing practices as described in more detail below.

## IV.    STATUTORY AND REGULATORY BACKGROUND OF THE GOVERNMENT HEALTHCARE PROGRAMS

### A.    Medicare

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg, establishes the Health Insurance for the Aged and Disabled Program, popularly known as

the Medicare Program. The Secretary of the Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS.

17.     The Medicare program is comprised of four parts. Medicare Parts A, C, and D are not directly at issue in this case. Medicare Part B provides federal government funds to help pay for, among other things, medically necessary and preventative services performed for Medicare beneficiaries.

18.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals, who are age 65 or older, or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. However, payments under the Medicare Program are often made directly to service providers rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

19.     The United States provides reimbursement for Medicare claims through CMS. CMS, in turn, contracts with private insurance carriers to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Part B Trust Fund"). In this capacity, the carriers act on behalf of CMS. At all relevant times, Defendants submitted claims to the Part B Carrier in Florida.

20.     The Medicare Program, through the Part B Carrier, pays a significant portion of every claim. The Medicare beneficiary, or his or her supplemental insurance

carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-pay." Beneficiaries also pay deductibles.

21.     All healthcare providers must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B.  A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

      a.    Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); and

      b.    Providing economical medical services, and then, only when, and to the extent, medically necessary. 42 U.S.C. § 1320c-5(a)(1).

22.     The billing requirements applicable to Medicare claims are set forth in Title 42 of the Code of Federal Regulations.  As part of these requirements, services rendered by physicians are subject to reimbursement at the rate specified in the physician fee schedule.

23.     Services rendered by non-physicians, such as physician's assistants and nurse practitioners, are generally subject to a 15% reduction from the amount set forth in the physician fee schedule.  42 C.F.R. §§ 414.52 & 414.56.

24.     Services rendered by non-physicians may only be reimbursed by Medicare at the physician rate if those services meet all of the requirements set forth in 42 C.F.R. § 410.26.  Among other things, this regulation provides that the services must be:

      a.    An integral, although incidental, part of the physician's professional service;

      b.    Commonly rendered without charge or included in the physician's bill;

c.  Of a type that are commonly furnished in physician's offices or clinics; and

d.  Furnished by the physician or by auxiliary personnel under the physician's direct supervision.

25.     Pursuant to the "integral, although incidental" requirement, the actual rendition of a professional service by a non-physician may only be reimbursed at the physician rate if "the physician performs an initial service and subsequent services of a frequency which reflect his/her active participation in and management of the course of treatment." Medicare Claims Manual, Ch. 60.1(b).

26.     Pursuant to the "direct supervision" requirement, "the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. §§ 410.26 & 410.32.

27.     Medicare's regulations allow for the payment of "x-ray therapy and other radiation therapy services," which are classified as "physician services." 42 C.F.R. §§ 410.35; 414.2.   The Medicare Benefit Policy Manual ("MPBM"), which constitutes binding guidance from the CMS, provides that "[x]-ray, radium, and radioactive isotope therapy furnished in a nonprovider facility require direct personal supervision of a physician." MPBM, Ch. 15, § 90.  The MPBM further explains that "[t]he physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." *Id.*

28.     In order to receive reimbursement from the Medicare Program, a provider must submit an electronic or hard-copy claim form called the CMS-1500 Form with the following certification:

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)**

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise permitted by Medicare or CHAMPUS Regulations.

For services to be considered as 'incident' to a physician's professional services, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's services, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

29.     On a CMS-1500 Form, the provider also must state, among other things, the procedure(s) for which it is billing Medicare. Providers use the Current Procedural Terminology ("CPT") numeric codes to describe on the CMS-1500 Form the procedures or services they rendered.

**B.      Medicaid**

30.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396-96v, is a system of medical assistance for indigent individuals. Though federally created, the Medicaid Program is a joint federal-state program in which the United States provides a significant share of funding. The Medicaid Program in the state of Florida covers, among other things, the cost of physician services.

31.     CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels, and administrative and operation procedures. The state pays healthcare providers directly with the state obtaining the federal share of the payment from accounts that draw on funds from the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The Secretary of HHS determines each state's federal share of most healthcare costs using a formula based on average state per capita income compared to the national U.S. average. These matching rates are updated every year to reflect changes in average income.

32.     Federal law requires that a state's Medicaid plan "provide such methods and procedures . . . as may be necessary to safeguard against unnecessary utilization of...services and to assure that payments are consistent with efficiency, economy and quality of care." 42 U.S.C. § 1396a(a)(30).

33.     Medicaid generally reimburses for services provided by nurse practitioners or physician's assistants in Florida at eighty percent (80%) of the reimbursement that would be provided had a physician provided the same services.  Fla. Stat. §§ 409.905(1); 409.906(18).

34.     ASSOCIATES' physicians were required to complete the CMS-1500 Form to submit bills to Medicaid.   The CMS-1500 Form, in turn, required ASSOCIATES' physicians to sign the following certification:

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

. . .

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the
services listed above were medically indicated and necessary to the health

of the patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

## C.    **CHAMPUS/TRICARE**

35.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

36.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. §199.17(a)(1). The TRICARE Management Activity ("TMA") oversaw this program until October 1, 2013, at which point the Defense Health Agency ("DHA") became responsible for TRICARE's oversight.

37.    The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. The Defendants serve patients in the South TRICARE region. TRICARE health

services are provided through both network, and non-network, participating providers. Providers who are Medicare-certified providers are also considered TRICARE-authorized providers. TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

38.    "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate. 32 C.F.R. § 199.14(a). "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations. *Id.*

39.    The TRICARE managed care contractor for the Region where ASSOCIATES's offices are located is Military Healthcare Services, Inc. This contractor currently lists ASSOCIATES' physicians as Network Providers.  To obtain status as a TRICARE Network Provider, ASSOCIATES signed a contract with these managed care contractors accepting payment at TRICARE's prenegotiated rates.

40.    Under TRICARE's billing requirements, the allowable charge for services rendered by a physician's assistant or nurse practitioner generally may not exceed 85% of the allowable charge for a comparable service rendered by a physician. *See* TRICARE Reimbursement Manual, at Ch. 1, § 6.

41.    Moreover, as with Medicare and Medicaid, TRICARE's governing regulations require that services be "furnished at the appropriate level and only when and

to the extent medically necessary," and that such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. 199.6(a)(5). As such, services provided at a level higher than the medically necessary are improper and violations of TRICARE. *Id.*

42.     TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5). Such practices are deemed abusive and cause financial loss to the United States. 32 C.F.R. §§ 199.9(b).

## V.     THE FEDERAL FALSE CLAIMS ACT

43.     The False Claims Act provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government,

\* \* \*

is liable to the United States Government . . . . (b) For purposes of this section, the terms 'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate in ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## VI.    DEFENDANTS' FRAUDULENT ACTS AND OMISSIONS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT

44.    Defendant ASSOCIATES is a medical practice that has treated thousands of patients throughout central Florida during the past several decades.

45.    Defendant ASSOCIATES was incorporated by Defendant STEELE, who was the practice's owner, managing physician, and president from 1989 through 2010.

46.    In or around 2010, Defendants STEELE and STEPPIE entered into an arrangement for the sale of Defendant STEELE's shares in ASSOCIATES to Defendant STEPPIE over a ten (10) year period.   Pursuant to the terms of that arrangement, Defendant STEELE remains the majority shareholder and continues to serve as a corporate officer, while Defendant STEPPIE serves as the managing member of the practice.

47.    In addition to his role as the majority shareholder and corporate officer, Defendant STEELE also owns all of the properties where ASSOCIATES maintains freestanding offices, and collects rent for ASSOCIATES' use of each of those locations.

48.    Through their medical practice, Defendants submitted, caused to be submitted, or conspired to submit, false claims for payment by billing the government healthcare programs for: (1) radiation services administered by a non-physician as if those services had been performed by a physician; (2) surgical procedures performed entirely by unsupervised non-physicians as if those procedures had been performed by physicians; (3) initial consultations and subsequent follow-up treatments performed by non-physicians as if those consultations and treatments had been performed by physicians; and (4) medically unnecessary biopsies.

A.      **False Claims Submitted in Connection with Radiation Therapy**

49.     On August 23, 2012, Defendant ASSOCIATES acquired a radiation therapy machine designed to treat skin cancer manufactured by Sensus Healthcare, LLC.

50.     Defendant ASSOCIATES acquired the radiation therapy machine specifically because the target demographic for this form of treatment was almost exclusively persons sixty-five (65) years or older who were able to pay for the procedure through Medicare.   These patients are generally the only persons who are suitable because the danger of radiation poisoning, which manifests itself after approximately thirty (30) years, outweighs the benefits of the procedure for younger persons.

51.     Initially, Defendant STEPPIE consulted with some patients and developed their course of treatment prior to the treatment being administered.

52.     However, for the vast majority of the patients who were treated after that brief initial period, patients were instead referred for a consultation for possible radiation treatment by a call center operator, a physician's assistant, or a nurse practitioner.   The call center operators, who lacked any formal medical training, would make these referrals simply based upon the patient's description of symptoms over the phone.

53.     Once referred, the consultation for possible radiation therapy was performed entirely by Relator Bradshaw.   At the time, Relator Bradshaw had an Associate Degree in Radiology from Kaiser University.   She was not a physician, and was not qualified to form medical opinions, perform unsupervised medical consultations and procedures, or formulate treatment plans for patients.

54.     A full course of radiation therapy involved fourteen (14) separate visits. Relator Bradshaw performed all of these treatments without any physician oversight from August 2012 through March of 2013.

55.     Instead of providing physician oversight, Defendant STEPPIE instructed Relator Bradshaw to call the radiation therapy machine manufacturer's representative for advice as to the proper course of treatment based upon the patient's symptoms presented during the initial consultation, as well as for advice as to how to bill for these visits with a physician's code.

56.     Pursuant to Defendant STEPPIE's instructions, Relator Bradshaw was eventually administering radiation therapy to approximately ten (10) persons at both the Dr. Phillips and Kissimmee locations each day of the work week without the required supervision.  This resulted in approximately twenty (20) total unsupervised therapies per day and one hundred (100) total unsupervised therapies per week.

57.     This process for administering radiation therapy violated the laws applicable to the provision of this medical service and placed patients in grave danger. *See* Fla. Stat. § 468.302 (identifying the licensing and supervision requirements for the administration of radiation therapy).

58.     One danger posed by this process is that the call center representatives would refer patients for radiation therapy that were not suitable candidates.  For example, one patient was referred for radiation therapy to be performed upon a nail bed.  This referral was dangerous because radiation therapy administered to a nail bed can cause the carcinoma to spread.

59.     Likewise, the call center representatives would also refer persons for radiation therapy near their eyes.  These persons were not suitable candidates because radiation therapy administered to a patient's eyes can cause the patient to suffer a loss or impairment of vision.

60.     Relator Bradshaw repeatedly told Defendant STEPPIE that she was not qualified to develop treatment plans or to administer therapy without any oversight, but he continued to instruct her to treat and bill in this manner for months.

61.     Defendants only allowed for occasional supervision beginning in March of 2013 after months of pleading by Relator Bradshaw.

62.     In addition to exposing patients to risk by not following the proper medical laws and standards, this process also violated the government healthcare programs' billing requirements.

63.     Specifically, although Relator Bradshaw conducted the entire initial consultation and subsequent follow-up treatments without any supervision by a physician, Defendants nonetheless billed the government healthcare programs as though the therapy had been initiated and supervised by a physician.   Examples of radiation therapy administered by Relator Bradshaw from August 2012 to March 2013 without any physician supervision but billed to the government healthcare programs under a physician code include therapies administered to the following patients at the following locations:

- A.S. – Kissimmee location;

- C.K. – Kissimmee location;

- E.W. – Kissimmee location;

- J.M. – Kissimmee location;

- T.T. – Dr. Phillips location;

- J. O. – Kissimmee location;

- B. M. – Kissimmee location;

- S. S. – Kissimmee location; and

- A. D. – Kissimmee location.

64.     As a result of the practices described above, Defendants have submitted, or caused to be submitted, thousands of false claims for payment to Medicare, Medicaid, and TRICARE for radiation therapy services at a physician rate that were actually administered by Relator Bradshaw with absolutely no supervision.

**B.     Improper Billing for Surgeries Performed by Non-Physicians at the Physician Rate**

65.     From at least as early as 2003 to the present, ASSOCIATES maintained multiple locations which would handle surgical procedures, including Mohs[1] surgeries and excisions.

66.     The locations were serviced by a single "surgical team." The surgical team would move from site to site throughout each day of the week.

67.     The "surgical team" was comprised of one (1) doctor; one (1) coordinator responsible for billing; and one (1) patient preparation person. The "surgical team" also

---

[1] Developed by Dr. Frederick Mohs in the 1930s, Mohs micrographic surgery has, with a few refinements, come to be embraced over the past decade by an increasing number of surgeons for an ever-widening variety of skin cancers. Mohs surgery has come to be accepted as the single most effective technique for removing Basal Cell Carcinoma and Squamous Cell Carcinoma (BCCs and SCCs), the two most common skin cancers

included three (3) non-physician medical assistants: Pete Contino (aka "Pete the Policeman"); Gammie Mestre; and Toni Gough.

68.     The physician would either perform a Mohs surgery or an excision on each patient at a given location.

69.     Under the controlling legal and medical standards, a physician must perform a separate consultation with the patient to determine whether and how a surgery should be performed to close any residual wounds created by a Mohs surgery or an excision.

70.     Rather than have a physician perform the consultation to determine whether and how a subsequent surgery should be performed, Contino, Mestre, and Gough were instructed to perform that consultation and surgery entirely by themselves. This process was initially put into place by Defendant STEELE and was later continued by Defendant STEPPIE.

71.     No physician supervised Contino, Mestre, or Gough as they performed the consultations and surgeries. Nevertheless, Defendants submitted bills to Medicare, Medicaid, and TRICARE which reflected that these procedures had been performed by a physician.

72.     Following this process, the "surgical team" performed approximately twenty-five to thirty (25-30) surgical procedures each day of the week.

73.     Upon information and belief, Contino had been employed by ASSOCIATES since the 1990's, and ASSOCIATES' surgical process operated in the manner set forth above during that entire timeframe.

74.    Patients were never told that their entire surgical procedure had been handled by an unsupervised non-physician.  Even more misleading, patients often referred to Contino or Mestre as "doctor," and were never corrected when doing so.

75.    Contino has admitted that he "always" handled the surgeries to remedy the wounds generated by the initial surgery "by himself."

76.    Defendant STEPPIE told Relator Brown that Contino performed various surgical procedures on patients' wounds when Relator Brown was at the ASSOCIATES' Sand Lake clinic for her interview on September 28, 2012.

77.    In addition, Relator Brown personally observed Contino standing by a cryostat apparatus[2] at the Sand Lake clinic and assumed that Contino was preparing for surgery.  Before she accompanied Defendant STEPPIE into his office for the interview, Defendant STEPPIE told Relator Brown that he had just performed a Mohs surgery on a patient.  After her discussion with Defendant STEPPIE and Contino regarding Contino's responsibility as a wound closer, Relator Brown assumed that Contino closed the patient's wound while she was in the interview with Defendant STEPPIE.  Relator Brown did not see any physicians in the building with the exception of Defendant STEPPIE.

78.    Contino also once showed Relator Brown a variety of photographs he took on his camera phone of client's faces that he had operated upon.

79.    Defendants submitted claims to Medicare, Medicaid, and TRICARE for the unsupervised surgical procedures handled entirely by Contino, Mestre, and Gough.

[2] A Cryostat apparatus is "[a] chamber that can maintain very low temperatures. Medical laboratories use a cryostat to preserve frozen tissue samples while a microtome, an extremely sharp cutting instrument mounted inside cryostats, slices the tissue into pieces thin enough to be observed under a microscope." MedicineNet.com, Definition of Cryostat, available at http://www.medterms.com/script/main/art.asp?articlekey=12235.

These claims were false or fraudulent because Contino, Mestre, and Gough were not qualified, competent, or credentialed to perform those procedures by themselves. Therefore, the unsupervised surgical procedures handled entirely by Contino, Mestre, and Gough were not reasonable and necessary, were incompatible with standards of acceptable medical practice, were worthless and of no medical value, and were not payable by the federal healthcare programs. Moreover, the federal healthcare program beneficiaries who underwent those procedures did not know any of the aforementioned facts and, had they known, they would not have consented to undergo those procedures, and no federal healthcare program payments would have been made to Defendants for those procedures.

80.    Defendants knew, recklessly disregarded, or deliberately ignored the fact that Contino, Mestre, and Gough were not qualified, competent, or credentialed to perform the procedures, and that the procedures and related hospital services provided by Contino, Mestre, and Gough were, therefore, not reasonable and necessary, were incompatible with standards of acceptable medical practice, were worthless and of no medical value, and were not payable by Medicare, Medicaid, or TRICARE, but Defendants nonetheless presented, or caused to be presented, claims to those healthcare programs for the unsupervised surgeries entirely performed by Contino, Mestre, and Gough.

**C.     False Claims Submitted for Initial Consultations and Subsequent Follow-Ups Performed by Physician's Assistants and Nurse Practitioners**

81.     From at least as early as 2003 and continuing to the present, ASSOCIATES maintained multiple office locations (eleven (11) locations in 2013) throughout central Florida where patient consultations and follow-up visits were handled, but often had less than five (5) total physicians on staff, some of whom did not handle patient consultations or follow-up visits on a regular basis.

82.     Given the great disparity between the number of locations and the number of available physicians, all of ASSOCIATES' locations were staffed by physician's assistants or nurse practitioners, and only occasionally staffed by a physician who traveled from location to location.   Therefore, the physician's assistants and nurse practitioners would solely handle initial consultations and follow-up visits for the vast majority of patients.   Moreover, the consultations and follow-up visits were exclusively handled by a nurse practitioner at the Davenport location, which was never staffed by a physician.

83.     The physician's assistants and nurse practitioners would sign their own names on the pertinent records.  However, the billing for the consultations and follow-up visits was ultimately handled by ASSOCIATES' Billing Department.

84.     Prior to submitting bills to the government healthcare programs for reimbursement, ASSOCIATES' office manager, Cindy Miller, instructed the billing staff, including Relator Santos, to white out the name of the physician's assistant or nurse practitioner and to replace it with a physician's name.

85.     The bills were therefore falsely coded as being handled by a physician, resulting in ASSOCIATES receiving reimbursement at the physician rate despite the fact that the consultation was exclusively performed by a physician's assistant or nurse practitioner.

86.     Moreover, because the initial visit was coded as being handled by a physician, all subsequent care was also billed at the physician rate despite the fact that it was, in reality, handled by physician's assistants or nurse practitioners.

87.     In total, the various ASSOCIATES locations handled up to approximately 360 patient visits each day of the week.  Approximately forty percent (40%) of these visits were reimbursed through Medicare, Medicaid, or TRICARE.

**D.     Submitting Claims for Medically Unnecessary Biopsies**

88.     As set forth in paragraphs 81 through 87, most initial consultations were handled by physician's assistants or nurse practitioners.

89.     During the course of this initial consultation, the physician's assistants and nurse practitioners diagnosed the patients, wrote scripts, and/or performed biopsies.

90.     ASSOCIATES paid the physician's assistants and nurse practitioners a commission based upon the amount of money they billed out for these services, including the amount billed out for biopsies.

91.     As with the prior schemes, ASSOCIATES was supposed to bill for these procedures at a discounted rate based upon the fact that the procedures were being performed by a non-physician, but ASSOCIATES nonetheless billed for them at the physician rate.

92.     After it acquired its own in-house laboratory, in late 2011, ASSOCIATES began to analyze the samples of the biopsies performed by the physician's assistants and nurse practitioners at the in-house laboratory rather than sending them to a third-party facility.

93.     As a result, ASSOCIATES generated a fee from government healthcare programs for both performing the biopsies and for analyzing the biopsy samples.

94.     Since acquiring its in-house lab, ASSOCIATES has been performing an inordinate amount of biopsies on patients. Specifically, while the national average is 1.3 biopsies per patient, ASSOCIATES averages a staggering 3.3 biopsies per patient.

95.     Defendants knowingly established the aforementioned incentivization scheme for the purpose of increasing their profits by performing medically unnecessary procedures, knowing that this scheme would and did result in medically unnecessary procedures being billed to the government healthcare programs.

## COUNT ONE
### Substantive False Claims Act Violations

96.     Paragraphs 1 through 95 are incorporated into Count One as if fully set forth herein.

97.     Defendants, by and through their agents, officers and employees, knowingly, or in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, *inter alia* 31 U.S.C. § 3729(a)(1)(A).

98.     Defendants, by and through their agents, officers and employees, knowingly, or in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, *inter alia* 31 U.S.C. § 3729(a)(1)(B).

99.     The Government payors, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare, Medicaid, and TRICARE. Had the United States known that the bills presented by Defendants for payment were false and misleading, payment would not have been made for such claims.

**COUNT TWO**
**Conspiracy to Violate the False Claims Act**

100.    Paragraphs 1 through 95 are incorporated in Count Two as if fully set forth herein.

101.    Defendants conspired with one another to get false and fraudulent claims allowed and paid by the United States.

102.    The Defendants conspired with others and withheld information specifically known to said Defendants regarding the fraudulent billing of patients and unauthorized practice of medicine.

103.    Accordingly, the Defendants acted in a concerted fashion to defraud the United States, and the Defendants acted with others in keeping the facts necessary to

investigate the fraud and the damages caused by the fraud away from the United States. Therefore, the Defendants violated 31 U.S.C. § 3729(a)(1)(C) and as a result of this violation, the United States has been severely damaged.

### PRAYER FOR RELIEF

**WHEREFORE,** Relators pray for judgment against Defendants as follows:

(a)    That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729-33;

(b)    That judgment be entered in favor of the United States and Relators and against the   Defendants in the amount of each and every false or fraudulent claim multiplied, as provided by 31 U.S.C. § 3729, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500) Dollars, and not more than Eleven Thousand and No/100 ($11,000) Dollars per claim, as provided by 31 U.S.C. § 3729, to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by the Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)    That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(d)    That judgment be granted for the United States and Relators for all violations by the Defendants of the False Claims Act;

(e)    That the United States and Relators recover any and all damages available to them as a result of Defendants' stated violations of the False Claims Act;

(f)     That judgment be granted for the United States and Relators and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of this case; and

(g)     That the United States and Relators be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

A jury trial is requested in this cause.

Respectfully submitted this 7th day of August, 2014 by:

*s/ Ryon M. McCabe*
**RYON M. McCABE**
Florida Bar No. 9074
**McCABE RABIN, P.A.**
**1601 Forum Place, Suite 505**
**West Palm Beach, FL 33401**
Telephone: (561) 659-7878
Facsimile:  (561) 242.4848
*Attorneys for Plaintiff*
*Email for service:*
*rmccabe@mccaberabin.com*

----- AND -----

**C. RICHARD NEWSOME, ESQUIRE**
Florida Bar No.:  827258
**WILLIAM C. OURAND, ESQUIRE**
Florida Bar No.: 092503
NEWSOME MELTON
201 South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile:  (407) 648-5282
*Attorneys for Plaintiff*
*Emails for service:*
*newsome@newsomelaw.com*
*ourand@newsomelaw.com*
*sucharski@newsomelaw.com*